Good morning, can you call our first case please? 17-1653, Tennessee Nelson v. Quarles & Brady, LLP Alright, can the attorneys on Nelson v. Quarles & Brady please approach and identify yourselves from the record? Good morning Your Honor, I am Mark Overman on behalf of the plaintiff. Good morning Your Honor, it's Michael Trucker on behalf of the defendant, Quarles & Brady. Alright, Mr. Overman, we have 20 minutes for oral, do you want to reserve some of that for a bit? I would like to reserve a few minutes for rebuttal, Your Honor. Alright, how many? Well, I'd say five. Alright, and you may begin. Thank you. Mr. Overman, go ahead, I'll let you start. May I please declare, I am Mark Overman on behalf of the plaintiff, Ken Nelson, who I would say is sitting here at the counsel table with us here on the end. Alright, thank you. You're welcome. And my undersecretary also on our co-counsel, Stephen Plotkin and John Mannix are here. So you guys do a good job, basically. Your clients are here, everybody's here. They have come here to assure that, Your Honor. There are fundamentally two issues in this case. Did Mr. Correa and Mr. Nelson have a binding contract for the sale of the stock for $4.2 million? And did Quarles & Brady have enough information to either investigate and find out if they needed to plead the enforcement of that contract on Mr. Nelson's behalf? The test, of course, is the manifest weight. So let's look at the first issue. Was there a contract? This case, as you know, was up here before in 2013, and the appellate court, this actual division, said, basic black-letter rule, that all that Mr. Nelson had to prove to establish his contract, I'm quoting, was that he offered to sell Correa all the stock for a total purchase price of $4.2 million, and Correa orally agreed. The evidence in this case is overwhelming to show that happened. Didn't you argue we were looking at this as the no-hold review? Not exactly, Your Honor. So you just mentioned earlier the manifest weight. No, it is the manifest weight, but I would like to emphasize this point, and I think the case law is pretty clear on it. The question is for this court to look at all of the evidence, not just any evidence is what they say, and see if the manifest weight supports the plaintiff's position or shows that no alternative outcome would have been reasonable other than to fine for the plaintiff. The cases where you have documentary evidence that's undisputed, as here, and you have a great deal of uncontradicted testimony, particularly from disinterested witnesses, as we have here, the case is saying you can look at that evidence yourself. You're not deferring to the trial court because the trial court's deference applies when there are credibility issues. Here there really aren't credibility issues. Here's a trial court that didn't even make credibility findings. So it's still manifest weight, but it doesn't mean that you can't review that evidence yourself. In fact, I think you're required to review it all. Let's take a look at the documentary evidence. We have the Johnson letter, the Director's Resolutions, and the Sacco-Hurricane. We have quite a few pieces of documentary evidence. I'll put those three first. All right. Okay. So in the Johnson letter you have that they approached the sale, but there were conditions that Mr. Nelson had, correct? That is what he wrote, and the e-mailing was Johnson, yes. Okay. And the conditions were not accepted by courier. Well, that gets into a complex discussion. What happened here was, and I think you have to look, what the instrument is trying to do is take that Johnson and opening the e-mail from a layman to a lawyer saying, I just got two exercises of options. Here's my memory of what we did. What do I do about it? But then for a case of this magnitude, you don't just go on the first e-mail that the client sent you. You sit down with the client, that's the standard of care, and say, what happened? Give me your documents. Who said what to whom? And that did happen here. And so shortly after that first e-mail came out, then it's the job of the lawyers, as Mr. Joyce testified to, to get to the bottom of it. So Mr. Nelson brings in, and some contested, the director's resolution. That's document number one. That resolution says the directors accept an agreement for Nelson to sell all his shares to Courier. Courier testified. When I signed that resolution, I believed I had an agreement. What was that agreement? That agreement was a simple agreement to sell the stock for $4.2 million. When is this all going to be done? Well, the hope is to get it done by the end of the year. Well, don't those things have to be terms of this oral agreement? Actually, as this court said in the earlier case, all you really need is an agreement to sell and a price. Well, the time of the package, though, changed that agreement, did it not? It did. It was two days towards the time of the package, Judge, and I'm glad you asked about it. Mr. Nelson testified that first they agreed on the price and on the sale, and that was separate. And then he said, I'd like you to add these perks. And he said Courier originally agreed on the perks and then renamed them. Courier said, well, I think the conditions were part of our law, and I never agreed to that. I agreed to buy the stock. But what did these people do? These were laymen. Right after he signed the director's resolution saying, I agree to buy the stock only, they then went to implement the agreement. Courier signed dozens of documents that are listed in places 10 and 12 of our brief. They sent to the manufacturers. The manufacturers said, the bankers said, Nelson said, Courier said, it's uncontradicted, you don't apply to the manufacturers unless you have a firm agreement. And so they did that. So what happened was, there may or may not have been conditions of perks, so to speak, that would be part of the agreement. But when Courier said, I'm not doing the perks, which he said by October 26th, by early November, both Nelson and Courier went ahead anyway and applied for the stock sale. And that's what they told the manufacturers. They had ongoing negotiations with regard to this retirement package. Well, here's what happened. And the testimony was uncontradicted on this. Sometime, so on November 4th, they do what they said they were going to do. Even after he rejected the perks, they went to the bank and they got the $4.2 million loan commitment that could only be used to buy the stock. Mr. Deeds sent all the bank loan documents, which Courier paid for, this was in early November, and I want to get to the point about these negotiations, to Nissan, Toyota, and GM. Nissan, Toyota, and GM said, we won't even process this unless you tell us you have an agreement. And if you would tell us that Toyota, when this said, Courier told us he had an agreement for $4.2 million. He didn't say, I'm still negotiating. He didn't say, I'm not selling if Ken insists on the perks. He said, we have an agreement. Then, and Nelson testified, Courier did not contradict this. Then, Courier contacts Nelson sometime in late November and says, you know what, I was talking to some of my buddies and some judge out here, and he says, I'm paying too much, I'm not paying $4.2. He recuviated that contract at that point. Subsequently, in December, those emails, where you point out, Ken, this guy, he treated this guy like a son. So, he wanted to sell, and he actually wanted Courier to own the dealership. He'd been with them for 15 years. He started sending them emails, look, I own the price, give me the perks, let's make a deal here. And Courier rejected it every time. So, yes, they continued to talk, but only after Courier repudiated that agreement. They had an agreement. Now, Nelson is not a lawyer. The agreement was essentially that Courier, or however you pronounce it, Courier was going to purchase the stock for $4.2 million. Period. As soon as the manufacturers would approve it. And now, are you telling us that was part of the oral contract or not? Yes, as you read, because of the oral contract. Now, we need to know all the specifics. Weren't you seeking that specific performance of this contract purchase? No, we were not. We were seeking a breach of the contract. We were seeking damages for breach of the contract. One of the myths. Give us all the specifics of the terms. All the terms. The terms were that Nelson agreed to sell, and Courier agreed to buy for $4.2 million, and they hoped to close by the end of the year. Remember, when they made this deal. There were no material terms outstanding at that point? None. They had agreed to go ahead. The evidence is not the perks. The evidence is that they were going in without the perks by their own conduct. This is the point. You don't ask Courier and Nissan to approve our agreement if you don't have a deal. They told them we had a deal, and they both knew there were no perks at that point. I thought, though, there was testimony that there was no way that this agreement could be effectuated by the end of the year through the dealers. No. Yes, but the testimony was not. No one said there is no evidence that it could have been done. What happened was, and this is uncontradicted, Courier stopped doing what the manufacturers asked them to do so they could get it done. Nissan actually did approve the deal on December 21st. They approved, quote, an agreement. It's one of the uncontested exhibits. I'm sorry. When was the point that they, or Courier, disagreed with the perks? In other words, you're saying there was this full contract, one to sell, one to purchase, 4.2 million the price. When was the, when did it arise that Courier said, I'm not going with the perks? The uncontradicted testimony, and it's only Mr. Nelson's, is that it happened in October, just before the October 26th email, which is why Nelson sent the email to him saying, you really should go ahead with the perks. Well, that's not, you're saying there's no counteroffer that the contract was firm even though the gentleman said, I am not going with any of these perks. Yes, because two days after. And then did Nelson say, fine, perfect, we have a deal? Yes. I don't care about the perks anymore? Was that in the record anywhere? Yes, what he said was, I sent the October 28th letter to Toyota, and there's another one to Nissan. He called two days later after that I had the perks because I believed I was obligated to go ahead with the stock sale. And Courier did the same thing. He signed all of those application documents in early November. This is not the conduct of people who don't think they have a deal for the stock. They both know, you don't sit around with the manufacturers and tell them, please process a stock deal. Well, they couldn't actually do anything without that approval. That's right. They couldn't do anything without that approval. Right, which is the proof that the negotiations were over when they asked for the approval. People sometimes go to secondary sources, banks and other people who have to give them approval before they have a final deal, don't they? People go to banks all the time to find out, am I going to be able to get this loan? I'm not wasting my time with all those negotiations, right? Well, they do, but that's not the testimony in this case. All I have is speculation that sometimes there are pre-approvals. No one said this was a pre-approval. It all came to court. So, we have a deal for a price, you're saying. We have an oral agreement on a price. We do not have an oral agreement on other terms. We do not have an oral agreement on these perks. Correct. And what you're saying is by their conduct, they indicated that those, by their conduct what? They decided that those things were immaterial, that they were going to be thrown out the door, that they were going to be, what were they, by their conduct, what were they saying about these perks? They were saying, they're not agreed, we have a deal for 3.2 for the stock only. And how do we know this? We know that they're not agreed, meaning what? Meaning they're not going to give me any perks. We're just going to sell the stock. Why does their going to the manufacturer or going to a bank indicate that they weren't still negotiating? First of all, the bank and the manufacturers are two different things. Sure. Agreed. Agreed. The manufacturers, there's two key points about these manufacturers. Right. The manufacturers testified, and Carina and Nelson testified, we don't go to the manufacturers until we have a deal. So, the evidence is not that we're still negotiating. There could be, but the evidence in this case is uncontradicted. We are not going to the manufacturers while we're still negotiating. We only go there when there's a deal. However, the manufacturers and the bank don't require an ink deal, do they? Well, apparently they didn't here because there's proof of it. So, it would be the custom and practice that you go out and you negotiate or you do whatever you have to do with the manufacturers and the bank prior to having an ink contracted deal. Well, I don't know if you always have, and it didn't come up in this case, what the custom was. But here's what we do know. One of the manufacturers, Mr. Zangri, said explicitly, you don't come and ask us to approve a stock transfer if you're thinking about a deal. You only come here if you tell us we have a deal. Mr. Newell from Nissan said, I quoted it in the agreement, the case wouldn't get off the ground unless you have an agreement. And then they approved the agreement. But do we think the manufacturers who keep watching these dealers like a hawk, do we think they're giving their approval for franchise transfer, which is very, very much protected, just guessing if these people have a deal? They assure themselves that they have a deal. And yet, weren't there several witnesses who said they didn't see any written documentation or were not privy to any oral contract? Well, first of all, no one, there wasn't a written, a hand-written resolution. You said they were not familiar with the terms. No, no, they didn't say they weren't familiar with the terms. They said that, Trudy Thomas, for example, wrote an email and said, the original stock purchase agreement was for both dealerships for $4.2 million. This was told to us in November of 2004 by Mr. Curio. That's a business record that went in without objection. Mr. Moore said, his actual testimony was that when he was shown the December 21st letter, which said Nissan approves the stock purchase agreement. It's a hand-written agreement. And Moore said, this approval, quote, this is at page 503, was the result of an agreement between Mr. Nelson and Curio, whereby Mr. Nelson agreed to sell his shares to Curio for $4.2 million. This is what was told to the manufacturers. This is powerful evidence that there was a deal with no perks. If there was such powerful arm in its fighting to pursue the claim in the state court, there was nothing in the federal district litigation that precluded that. Is that correct? Well, you're talking about in 2010, after the 29th, after the 7th Circuit? Well, first of all, you know that's a good question. Nobody asked that question. But by 2009, when the 7th Circuit reversed, just look at the situation there. And this evidence was uncontradicted, Your Honor. Mr. Nelson had just spent $700,000, $476,000 in wealth and weight and another two-something on his replacement lawyer to handle the appeal. He's already got that. A. B. Because of the forced transfer of the Plaza stock over to Curio under the specific performance order of the district court, Curio gained control of Plaza, and because of the cross-pollinization of the financing with Fifth Third, Plaza controlled them all and then run it into the ground. And they were in default on their loans, some of which were personally guaranteed by Mr. Nelson, including by putting up his house in Florida. And the bank was after Mr. Nelson and said, if you keep fighting with Curio after the 7th Circuit, we're going to take your house in Florida and we're coming after you. Let's go to the initial meetings now with quarrels and breakups. All right? Yes. At the first meeting, did Mr. Nelson inform anyone at the law firm that there was this oral contract for him? The first in-person meeting that night. No, forget in-person. Well, I'm not sure what you're talking about. The first contact was that Mr. Nelson sent his first email to Kim Johnson saying I just got these notices of option exercise. I need help. Yes. He said, I'm going to put you in touch with Gabby Ellis. He's a contract lawyer in Chicago. Yes. There's some telephone calls. There's not much going on. This is in March. So the first real meeting that I'm aware of and testified to at length was on April 20th. Mr. and Mrs. Nelson and their son, who has just finished law school, came up here and they met with Mr. Gabby Ellis at the office. I assume that's the meeting you're asking me about. The testimony was elaborate by all three Nelsons testified at the trial, that they went in there and they said, look, we had a discussion and agreement. Remember, Mr. Nelson's a layman. Sure. He doesn't come in and say, I have a congruent oral agreement. He said, we sat down, I said I'll send it to 4-2, he was excited about it, we went ahead. It's up to the lawyers to figure out if that's an agreement. So was there contradictory testimony by the attorneys? That's a very pertinent question, Your Honor, and I brought the exact testimony. So they explained at length what they said to him. I asked Mr. Gabby Ellis. Do you remember the meeting on April 20th where Mr. Nelson and Corey told you they had a conversation and you said it's an oral agreement and it's not incompressible? He said, I don't remember. I pursued it because I've had witnesses like this before. I pursued it at depth and I pursued it at trial. Here's the exact testimony at page 1392. Question. During that meeting, do you recall telling Mr. Nelson that this agreement for the sale of a stack for 4-2 was an oral agreement and not enforceable under Illinois law or words to that effect? I don't recall that. Is that saying he doesn't recall saying it? Or he doesn't recall a conversation? Next question. Key. You actually don't even remember enough about that meeting to be able to say that that conversation did not take place, correct? That is correct. He doesn't contradict Mr. Nelson. Did he say anything later in the testimony? Yes. Then what happened was after I finished questioning him, the trial judge said, did you tell Mr. Nelson at that meeting that oral contracts aren't enforceable? He contradicted himself. No, I didn't say that. I went back and impeached him from his deposition with the same question. Did the trial judge in this case find that Oralton Brady did not become aware or was not aware of this oral contract at that meeting? The trial judge didn't specify anything about that meeting or any other specific piece of evidence. The trial judge just said in a very, very abbreviated opinion that said the evidence fails to prove that Oralton Brady was ever aware. And for some reason picked out a date of April 29th. That's what she said. She said that the evidence fails to prove that Oralton Brady was ever aware before filing the lawsuit in district court on April 29th that Nelson felt he had reached an agreement. But April 29th was, first of all, there was plenty of evidence before April 29th. And what's really stunning to me when you talk about uncontradicted evidence, Mr. Gacielos wrote a letter, and I quoted from this in the brief, and I think it really conclusively answers the question. He wrote a letter in a way that he drafted it for Nelson to send to the bank because the bank was threatening to foreclose, as I was saying. Here's what Mr. Gacielos wrote. In September of 2004, this is two Ds from Nelson, Career and I worked at Switzerland to loan Career our read-upon purchase price of $4.2 million for my share. Then he, I'll skip along. You gave a letter approving the loan of $4.2 million to purchase my shares. The stock purchase was supposed to close by year-end, but Career reneged on agreed price. And I showed him the letter at trial, and I said, the information that you wrote here, Mr. Gacielos, you have known since the beginning in April of 2005. And he said, yes, generally I did. So he admitted on the stand he knew it. He admitted on the stand that when he got the director's resolution, that before April 27th, and I have that testimony where he admitted he had the resolution, he had the November 4th bank letter, that he was on notice that there may have been an agreement before April 29th. He admitted it! So when that one's going to be evidence, overwhelmingly it disproves what the child court said. In Ken's story? Well, remember there was a document. There was a document. All right. Is there anything about the oral contract in Ken's story? I don't believe there is. But remember, Your Honor, this is after... Well, didn't he say in Ken's story that Career did not accept the offer? Because that is what Gacielos had told him. It's not a legal acceptance in Illinois. And he was dealing with that all along. Did he ever mention it? No, no, he did mention it on April 20th. This Ken's story came up months later. What happened here, the negligence here is, the client comes into the office on April 20th, and leave aside Gacielos' non-denial denial, that he can't deny what Nelson told him, leave that aside. What Gacielos admits to is I had, he's already admitted to it, he said, I had a letter sent to Lucia saying there's an agreement. I had a bank letter of November 4th committing to loan $4.2 million. It doesn't say pre-approval. It says to fund your purchase for the shares. That put me on notice. There would have been an agreement. We also have these emails from Nelson saying, oh, we went to the bank and $4.2 was the price we agreed that we needed. No, that's not lawyer's talk. That's a man trying to tell his lawyer, here's the kind of things that happened. Can I ask you just one question about the initial agreement? Are you saying that the initial agreement for the purchase for $4.2 million, that Mr. Nelson never suggested to anyone that he wanted these nine perks? No, no, I'm not suggesting that. Are you saying then that actually the initial negotiations were for the sale for the $4.2, but that sale included all the perks that Mr. Nelson was envisioning as part of his retirement package? Here's the way I'm telling you, Your Honor. These people were in the office together every day. That was the testimony. And they talked about the sale of stock. When it came time to draft up the resolutions in October, this had been going on since July, Nelson says, you know, it's traditional for the founding dealer to get a car and so forth and so on. When they put that in, and in exchange, you know, I put up a great name on TV every day, buy cars from Ted Nelson, you can keep my name on the dealership. Initially, it was said, fine. Is that part of the contract, too, or no? Well, we did not sue for that. I think you could have made that argument. But think about it this way. So that sort of makes this like a very shifting oral contract. Maybe it included the name. Maybe it included the perks. Maybe there really wasn't an actual oral contract that was ever formed. You didn't have all these things. Even initially, you were agreeing that Mr. Nelson was fully expecting perks. Well, when he said fully expecting, he asked for it. And then the other guy, he says, well, I'm not going with the perks. At first he said he was. Then he said he wasn't. But remember, remember this, Judge. I'm just trying to make sure that we have an oral contract. I agree with you. I couldn't agree with you more. I think it's key. You've got two women talking to each other. Yes. What's so crucial about this is that, two things. After Camila said, no perks, I changed my mind. You don't get the perks. Nelson said, I will go ahead with the stock sale anyway. And he did. And so did Korea. There was a deal. And they told the manufacturers that. And they signed the case in our brief. I don't have it right in front of me, but it's in there. If the perks, even if you wanted to say, no, the perks were part of the deal, I think that they had talked about it and abandoned them, but Nelson couldn't get them. The perks were for Nelson's benefit. The case law says, he's in top of that condition, which in effect is what he said he was going to have anyway. Either way, we still have a contract. What's important is, can the court figure out what these partners agreed to? By their words and by their conduct, they clearly agreed to go ahead. Remember, they're operating in a culture of automobile manufacturers. This is not two strangers making a deal. And they live and die with these manufacturers. But this isn't a condition you can waive, though. It's not a condition at all. It's a term of the contract. Well, let's do this. Let's go back to law school. So an offer is made by, let's say Nelson makes the offer. It says $4.2 million in these perks. According to you, Korea then says, accept. But then within some amount of time, not shortly thereafter, he says, wait, no, not accept. I don't accept those nine terms. Okay? When you're marrying a girl, right? And so on. Well, that's for stock options. Well, fair enough. But then Nelson, you're saying, says, okay, forget that. Forget those nine things. I forgo them. And you're saying at that moment, the rest of the contract became locked in. Well, it did. You don't have to ever get to that point at that moment that locks it in. And remember, and I cited the restatement, that the formation of a contract has no set form. The restatement says words, writing, and conduct. And what seals it is first you have the discussion and the agreement on a price, and then you have the conduct, which is crucial here. You first have to, and I think Justice McBride was trying to do this, we have to pin down what were the terms of the contract. If I understand you correctly, they were at first a bunch of perks, and then at some point they stopped having the perks. Well, I don't think that's the way it actually happened. What happened was, according to the testimony, is that first they agreed just on a stock sale. That happened in July and August. Very informally. How informally? I think it was, because all that was necessary was that Nelson said, I'm willing to retire and sell, and my price is 4.2, and Carina said, let's do it. Okay. That's all you need. And we have to remember, when Nelson sat down to write these resolutions, Nelson said, by the way, I like the perks too. So I don't think that, in my way of thinking, that was a separate, you know, it wasn't a precondition. They already agreed with it, they already met with the bank by that time, the bank had already made a separate deal. I think you could. What would be the consideration for that deal? You can't parcel that out. Well, I think actually the consideration for that deal is stated right in that resolution that Nelson will let Carina continue to use his name all over Central Illinois, because he owned that, that was Nelson's name. And it's right in the resolution. You had a separate oral contract. There were two oral contracts? Well, if there was an agreement on the perks, it was a separate, Nelson, you know, this is where there's a contradiction. Nelson said, he initially said, yes, you can have the perks, and he changed his mind, he wouldn't sign that resolution.  Look at what these laymen did. They had a stockholder's resolution that listed the perks, and they had a director's resolution that just said we're going to sell the stock and get the bank financing. And the testimony was that Nelson typed these up himself, too cheap to go to a lawyer, he put them on Carina's desk at the dealership, and sometime in October, after that meeting, it was by October 26th, we know, because that's when Nelson wrote the e-mail, Carina signs the director's resolutions. And his testimony is, when I signed those, I had a deal to buy stock. That's his testimony. I didn't sign the stockholder's resolutions. I didn't want to give them the perks, too. That's enough. The question is, did these people have a meeting, and they're like, no, it can't be said. You know what, without the perks, I'm not going to have it. There is no contract. But Ken didn't say that. Ken signed the director's resolution, too. And then they both went ahead and implemented it, and they told the manufacturers, we have a deal. Those are admissions. So if you're looking at the manifest way of the evidence, the manifest way is, these people thought they had a stock deal because they went to implement it. But let me just, I want to make sure I understand what you're arguing. Are you arguing those were two separate oral agreements, one for the perks with the consideration being he gets to keep the name, or was it one contract, one oral agreement, with the perks that were later somehow amended out? You know what, with all due respect, in order to prevail in this case, I don't think, we'll try to answer your question, but I don't think Mr. Nelson has to make that choice. Whatever the deal with the perks was, I think my answer to your question is, whether it was one deal, whether it was two deals, whether it was one deal and later conditions were agreed to be taken out, it's beyond dispute that there was a deal to at least sell the stock for the $4.2 million price. How you characterize whether they had a separate deal or not is irrelevant when you're trying to enforce it. If we were, or if it were the other way around, think about it this way. Suppose Nelson had said, I don't want to sell the stock for $4.2 unless you throw in the perks, and was curiously saying, no, we have a separate deal. You might have a different question. But that isn't what happened here. And if you think about the real world reality of these two businessmen, the perks, if you add them up, are worth a few thousand dollars. Who in their right mind, Mr. Nelson wanted to retire and wanted $4.2 million. He could buy a new car every year. He's not going to walk away from a $4.2 million deal because he doesn't get the honor, really, of driving around Dixon in a new car every year. He was living most of his time in Florida. Sure, he wanted it. But that wasn't the real world. Why don't we cancel if two parties make a deal, or let me say, if they're negotiating a deal, and they agree on the big thing, which is price, and we'd all agree that's the big thing, the price of the stock, but there are other terms, and they don't agree. Can we decide who is to benefit from those conditions? Just say, okay, I'm suing you for breach of contract, and I'm not going to ask for those other things. Isn't the other side entitled to at least be of the mind that we have not agreed yet? This is all a package? No, it isn't. Well, why not? If we're trading different conditions, in my mind, we don't have a deal until everything's figured out. I think it depends on each contract, Judge, so I think it's a very pertinent question. But in this case, all Mr. Carino wanted was the stock. He didn't want anything else. If Carino had said, oh, no, I've got some other things, too, but Carino said, he said it in his testimony. I agreed to the stock only. That's all I wanted. Then you have that deal. Somebody else may say, oh, there are other terms, but that's not the deal here. I still go back to this question. These people rise and fall at these manufacturers. If you know anything about the car franchise business, the one thing dealers don't want to do is run afoul of the manufacturers. If you look at all the documents that went into this case, these manufacturers were sending all these financing documents up the chain. Their supervisors were reviewing it. You don't ask them to do that. You don't come in and say, which Carino said. There's no dispute. He never denied what Julie Thomas said he told her. You don't come in and say, please do all this work reviewing our stock purchase, and then after they approve it, they say, I don't know. You know what? We don't have a deal because I wouldn't give Nelson a new Cadillac every year to drive around in. Forget the whole thing. They said we have a deal. So these e-mails that were sent in April, didn't one of them, one of the e-mails to Fagesio, let's say, talk about, I think this was with respect to the fifth bird financing, that $4.2 million would perhaps be the selling price and that it would be about what Curia needed? There were two e-mails, Jerry. One of them said what you said. The other one, the first one said, and I quote, it's Exhibit 104, we have a fifth bird bank come in and discuss our needs and came up with $4.2 million of funds. Grabbed deeds from the bank, okay, that amount for the sale. I mean, that's, the sale sounded like a deal to me. Since that was the figure we agreed that we needed, that was the figure that we agreed that we needed, perhaps that would be the selling price. They were talking about trying to settle with them at the time. Now, the key thing here as to whether these people had enough information, and I think it's boiled down into one question at trial of Mr. Gaciovas. And I put, you know, as a legal malpractice, most of the people sitting in this room are lawyers. We've all had clients come in. So I just said if it was a quarter of a million, I think this kind of gets to the essence of what was the negligence here? Question from me to Gaciovas. So if we go back to April 27th, this is before the trial, because they didn't know anything. You've got this email referring to the $4.2 million. I was showing him the one that says this is the amount we agreed that we needed. You've got a letter from the bank committing to the $4.2 million. You've got two signed director's resolutions saying there's an agreement for the sale of shares in October. You've got letters in the Kim Johnson packet, that's that first email, that we had a bank ready to fund it, but no mention in that one of $4.2. You've got all of that information as of April 27th. Agreed, Mr. Gaciovas? Agreed. Question. And you don't remember sitting down or calling Nelson and exploring with him, Ken, can you put this together for me? You sent this packet, you don't mention this, now you show me a letter. Did you ask him these questions? No, I don't recall I ever asked this question. So, this is what he said the day before. Anywhere. Anywhere. And you give him all this information. He wants to say, you sent me a confusing email. I'm not asking any questions. That's the opposite. What do you mean? And remember, Gaciovas had handled a car dealer deal once. He admitted, he said, I know the manufacturers have a lot of documents. For $476,000 in fees, would you think he'd pick up the phone? If he'd called Julie Thomas on April 27th, she would have told him that, she'd email him later. But if she'd called Mr. Newell, he would have found out that he signed an all-inclusive stock agreement. That would have put him on the right track. He'd bury his head in the sand. Why? I think it's because he didn't think that all agreements were enforceable. But in doing, it doesn't make any difference. Mr. Overman, I know you wanted to reserve some time. So let's wrap it up. To be honest, I think the manifesto that I didn't even get to, Deeds' testimony, who testified, that he, quote, he confirmed, there's a quote in the brief, he confirmed to Nissan that they were funding $4.2 million for the purchase of the stock. That's truly his own backer, who they say, and I think he was, a very hostile witness. But he admitted it. Everybody testified. There was a deal, it was $4.2 million. Career says only, oh, there was a deal for some certain, I don't remember. Oh, by the way, it wasn't $4.2. In the face of everything else, and then he did admit. I said, well, what about this $4.2 million loan? He said, oh, yes, that was for both stores. So in effect, he admitted it early after he denied it. It's overwhelming manifest. It's overwhelming evidence that shows it. And I'll say the rest of it. Thank you, Your Honor. Thank you, Mr. Overman. Thank you. I have a manifest ready to pay. Counsel, could you spell your last name for me, so I can get the pronunciation? It's Trucco, T-R-U-C-C-O. C-C-O, got it, Trucco. All right, Mr. Trucco, you may proceed. Your Honor, can you please record? Mr. Nelson received a full and fair trial before the trial court. And what Mr. Overman is asking this court to do is to listen to his recitation and his characterizations of the evidence and substitute its judgment for what the trial court heard from the actual witnesses. And applying the manifest grade standard review, which is apparently not in dispute any longer, the most important part of that standard, as we cited in the brief, is that to obtain the reverse of the plaintiff must present evidence that is so strong and convincing to overcome completely the evidence in the defendant here's failure. And his inability to answer questions directly about whether the agreement had perks or other conditions or what was the impact of the manufacturer's approval shows that the evidence that he has marshaled in this court is not so strong and convincing to overcome the credibility determinations and the weight that the trial court gave to the testimony. Well, Mr. Trucco, this is a legal malpractice action. Yes. And in this case, there were actually experts that gave their opinion regarding whether or not there was breach. Yes. Whether there was an oral contract, whether there was breach, duty, negligence action. The legal malpractice requires, at least here, for someone to say that the firm or the lawyer specifically breached his duty to his client. Yes. And so here we have an expert saying he did, Mr. Joyce, and then we have an expert saying that the firm and the lawyer did not breach, Mr. DeVito. Yes. So the judge made a decision about the experts, didn't she? Yes, she did. And what did she conclude? She concluded, Your Honor, she made four specific findings in her order, and she said there was no negligence in failing to investigate an alleged oral agreement that she found was not made known to plurals until after the district court decided to send a judgment. She found that. She then on the causation side of that, and she heard her testimony from both of the experts about what would have been proved or provable by that trial, the admissible evidence of trial. She heard from both of those experts. Indeed, I think there's a record that shows that Mr. Joyce didn't even address the issue of admissibility. He just talked about what the evidence was and conflated it all. And then, I don't know if Your Honor wants about the litigation decision, she heard conflicting testimony from the experts about whether or not ambiguity or imperfect exercise needed to be argued consistent with the standard of care or not. And she found on those points specifically that there was insufficient evidence to establish negligence in this regard. That's a quote from the order. So, yes, the court did hear expert testimony. The court questioned the experts. The court observed the experts' testimony. And as we said in the papers on the mobile lawyer case, the court is free, the trial court is free, to accept and reject and give whatever weight the trial court wishes to the quality of the expert testimony. And with respect to the quality of the expert testimony, I would submit Mr. Joyce said that he understood that the contract had perks associated with it. Even he wasn't clear on what the nature of this alleged $4.2 million oral agreement was. Why wasn't there an oral contract formed in this case? Because there was simply no meaning of the minus. And there's one very important piece of evidence along those lines. There's several very important pieces of evidence. The evidence that was before the trial court was different as to the dates. Did it happen in July? Did it happen in August? Did it happen in September? That was a moving target. Second, from the outset, and I think the documentary evidence is overwhelmingly clear, that Mr. Nelson always conditioned the sale on the perks. And I can go through that for the court. Third, with respect to this number about $4.2 million, the testimony from Mr. Nelson was when he sat down with Mr. Peoria, he took out the June 30th financial statements and calculated according to the provisions of the 1989 Stock Purchase Agreement. But when we run a trial, is that he adheres to that equation, but we're not present in the 1989 Stock Purchase Agreement,  it's not 4.2. This evidence was a moving target as to what the terms of that agreement were. And importantly, Mr. Olbermann focuses on the director's resolutions. It was admitted. In the director's documents, doesn't it say that there was an agreement to reach an agreement? It said that Mr. Nelson would sell. And I will get the actual document back here, Your Honor. It referenced an agreement to approve the agreement reflected in the stockholders' minutes. And that's where I was going. When Mr. Nelson testified in his deposition, which was an admission that was introduced at trial, he was asked, as it related to those director's resolutions, what was the agreement that was referenced? And he identified the agreement in the stockholders' minutes. And that was an agreement that, importantly, did not save for $4.2 million. Paragraph 1, by the way, conditions of sale. Paragraph 1 said, The sale of the stock to Richard Currier in accordance with the Stock Purchase Agreement dated February 23, 1989, between Kenneth Nelson and Richard Currier didn't save 4.2. So the agreement, by his own testimony, The agreement reflected in the director's resolution was the agreement in the stockholders' minutes that says the 1989 agreement, and says conditions, and there are nine of them. What's the price pursuant to the stock? We're still going back to that, Your Honor. But if you take it, the formula was based on the General Motors financial statement at the end of the month. In other words, there was a price. I don't even know what it was. It was a formula. If there was a price, it would reach a price. It would reach a price. And that price was not 4.2. It wasn't 4.2. It was 4.1 with it adding into it two variables that weren't in the formula. And that was undisputed. That issue was undisputed at the time of trial. Counsel, whether there wasn't a moral agreement, correct me if I have this wrong, that speaks to causation, right? That speaks to proximate cause. In other words, even if there was an agreement, it wouldn't matter because there wasn't a moral agreement. Yes, Your Honor. That's at least how I see it. As to negligence, isn't the question whether a reasonable lawyer would have been put on notice to inquire? Fair enough. Okay. So you've got all these documents. Yes. You've got documents with the bank. It could have been a pre-approval, but it's still documents with a bank trying to get a $4.2 million loan. You go to the manufacturer for approval of the deal. You've got all of these documents. The lawyer doesn't ask the question, hey, are we arguing an oral contract? Let me address that issue because as it relates to negligence. First, the trial court judge heard from both Mr. Joyce and Mr. DeVito on that. And Mr. Oberman has presented to this court that there was uncontradicted testimony. There was nothing about this case or any issue in this case that was uncontradicted or not controverted. And so let's throw away the oral testimony as to what people remembered years later. And if you focus on Mr. Nelson's own writings, what he told Quarles and Brady, the very first letter, the March 8th Kim-Johnson letter, talks about in September, again, a moving target. When was this agreement? Second, conditions. Into Kim-Johnson from the outset. Third, nothing about career success. He wrote, Mr. Nelson wrote to Mr. Paganiolos on March 29th. He talked about offers. He talked about offers. Nothing in there about an acceptance. Now, Mr. Oberman suggests that they're just lazy people. They don't know what they're doing. Mr. Nelson's a card dealer. And I asked him at trial, how many thousands of cards have you sold that are based on an offer and an acceptance? Mr. Nelson knows what an offer and an acceptance was. And when he wrote to Quarles, the first two things were about offers and conditions. Next, a lot is made about that April 20th meeting. And, Your Honor, you identified this issue. The April 27th email. Seven days later, first of all, it talks about September. Not July, not August. It talks about September. And Mr. Oberman didn't read the whole thing. Since that was the figure we agreed was needed, perhaps that would be the selling price, including all the perks, et cetera, that Rick would be more comfortable with. Not that Rick agreed to, but Rick would be more comfortable with. Two days later, April 29th. In another email, And to prove an oral contract, yes, that was the first Nelson opinion. The terms of an oral contract have to be definite and certain. The Supreme Court has said definite, certain, and unequivocal. All I'm saying is, you've got all this documentary evidence with the bank and with the manufacturer. Yeah, Mr. Nelson is not your average layperson. He's probably more sophisticated than a successful businessman. But still not a lawyer. I mean, the lawyer's job is to take the facts and say, here's what the law says about those facts. Yes. Whether or not there actually was an oral contract or not, wouldn't a lawyer in that situation at least explore that? Say, hey, you know, there might be this argument. Let's talk about it. Tell me everything you know. Let's look at all these arguments. Let's see if we have a legal argument here that can lock Curia down via an oral contract. Fair enough. And the testimony from the experts at the time of the trial, I'm sorry, the factual testimony, Mr. Nelson said he provided quarrels and debris, everything that he had. Okay? And Mr. DeVito testified that there was nothing about all of that that would lead that, again, reasonably careful lawyer under the standard to question Mr. Nelson's own writing about the lack of definiteness of a contract. And we get to the issue of the manufacturers and Mr. Curia. Very important. Mr. Curia testified at trial that when he said he was referring to I had an agreement, he was referring to the 1989 stock purchase agreement. And how do we know that? We know it in a couple of ways. He submitted an affidavit to the Federal Court, paragraph 46. That affidavit was admitted into evidence as past recollection reported. Since 1989, I have been aware of and asserted my right to purchase the shares in the real estate under the 89 agreement. Second, he testified. Did you ever, ever have any agreement to sell your 4.2 and all the agreements to sell your shares for $4.2 million? Absolutely not. Absolutely not. I don't think so. I don't think that was you included in your. Page 616 of the record. Then what we also have is a document. And you'll see that the correspondence is attached in the exhibit. There was the chronology of the Rick and Ken stock purchase or whatever it was entitled. And on page 2141 of volume 2 of the record, Mr. Nelson in early November said, I'm sorry, Mr. Curia, 10, please allow this to serve as written notice to exercise my option to purchase the remainder of the stock. That was in early November. The significance of that is that Mr. Curia testified he was pursuing a purchase. But pursuant to his agreement and the option that he was granted back in 1989, and it was after that or contemporaneous with it, Mr. Curia issued his 4.2 letter. It was after that that all the loan documents were prepared. It was after that that all the efforts were made with the manufacturers. So, yes, there was a lot of activity. The parties were kind of buying this out. But there was a complete myth on the meaning of the monies. Mr. Nelson wanted 4.2 in first. What did Curia think was happening when they went to the bank and asked for 4.2 million? What he testified to was they went to the bank because he always knew he had the right to purchase under the 89 Stock Purchase Agreement. What he testified to is he was seeking a sum of money that was sufficient to buy the shares and to operate the dealership. Now, that issue was contested in terms of whether the third would loan to do that or not. But that's what he testified to as to what his intent was. And he testified in the document showing. All he was ever willing to do, because Mr. Nelson was overreaching, was to follow the terms of his agreement, the 1989 Stock Purchase Agreement. Now, as it relates to the manufacturers, a couple of very important points, and this is as to that. Mr. Nelson testified in his deposition as an admission that one of the terms of the contract was that it closed by December 31. He pleaded that in his pleadings in the underlying case, in the malpractice case. That's a condition. He didn't meet that condition. And Mr. Olbermann talks about the manufacturers. The quality of the evidence, Mr. Zangri's testimony, he admitted he made an assumption about the purchase price. Julie Thomas admitted that she had no personal knowledge. Who admitted they made an assumption about the price? Mr. Zangri, Sam Zangri, he said he made an assumption. And it was an assumption that was based on Mr. Nelson's letter that said, I propose to sell my shares to Mr. Correa. He made an assumption. But you're saying when the manufacturer approved, they did not know what the sale price was? Well, I'm getting to the issue of approval. And the record is clear on this. Toyota would never approve this deal as structured because it violated their standards for cross-collateralization. And the record evidence shows that clearly. So, yes, they knew of the deal. They knew of the proposal. They knew that Mr. Correa had gone to Fifth Third Bank and gotten loan documents. But those loan documents show that all of the shares were cross-collateralized. And Toyota rejected any deal that was based on cross-collateralization. And you'll see that in the record at pages 285 and 286. Meantime, Nissan said we'll approve the deal. But they conditioned it on the receipt of certain documents by a certain date. That's February of 2005. They never received those documents. And, more importantly, General Motors gave approval in June of 2005, six months later. And the approval was conditioned on the receipt of a written stock purchase agreement. So, as it relates to all of this, whether it's on the investigation side and what we were alarmed at the investigation involved, or if it's on the causation side, as to what would have been able to improve that trial in a case for breach of an alleged 4.2, there were no documents certain in unequivocal terms. There were conditions that were not met by the admitted closing date that had to happen. And Judge Coates heard all of this. And, importantly, about that trial, 15 days of trial, 15 witnesses, I believe 14 of them were alive. At the end of the evidence, she asked each of us to give her our points, our views on 13 specific questions. The plaintiff provided her with 56 pages and some 86 record sites. We provided 15 pages with 117 record sites. And based on that, Judge Coates made a very reasoned decision. And that decision was entitled as based on the credibility and the demeanor of the witnesses. And under the manifest way standard of review, the plaintiff has failed to show this court strong and convincing evidence to overcome those findings. It wasn't addressed in Mr. Olbermann's. I don't know if the court wants to hear about the issues or the matters related to the litigation decision side of the case. Just briefly, there were specific findings made, both on the issue of standard of care and on the issue of causation. And that was a... There has to be any real provable oral agreement in this case, or is it rather that the attorneys had an obligation to... Well, I believe that there were two issues. One, what was the standard of care and did the standard of care require the attorneys to inquire or inquire more? That was a separate issue. The significance of the provable oral contract goes to the plaintiff's burden of proving the case within the case in a legal malpractice case. Had to prove that had that argument been made, the trial of fact would have found a rule 4.2, I'm sorry, an oral agreement for 4.2. So the attorney doesn't, of course, have to find that there had to be an oral contract that would have been enforceable in order to establish that there was a duty to the client to at least inquire about this oral contract, that there was a breach as a result of that duty, and that there was approximately caused damages as a result. So doesn't there have to be this finding by the court that there was an oral contract that could be proved in order for the plaintiff to establish the legal malpractice? Or am I missing something? I think that the court would have to find that on the causation side of the case. The plaintiff's theory was not regarding negligence. It was a failure to investigate. And so was there enough evidence to investigate? It was a duty to investigate. No. The attorney should have inquired. I don't believe, and I will rely on what the opinions were of Mr. DeVito and Mr. Joyce. I think both testified that lawyers have a duty to learn the facts. Both testified that lawyers can rely on what their clients tell them about the facts. So I don't believe it was disputed as to whether a lawyer has a duty to learn the facts of a representation. I think the dispute was the extent of what needed to be done and whether it was compliant. And I'm the appointee on the causation side of the case, and I think this is critical. The notion was that they could and we should have asserted this $4.2 million claim. Doesn't the actual amended negligence complaint allege that there was a failure to compel specific performance? Yes. Yes, and Mr. Joyce tried to thread a needle because of that and say, well, you could have financed it by seeking a declaratory judgment and then getting ancillary relief to the declaratory judgment. But however you parse it, if Korea is going to be ordered to pay $4.2, Nelson's got to give up his shirt. That's specific performance. That's compelling specific performance of an agreement because under no construct would it be that there was And it wasn't the claim here that he could get $4.2 million and keep his shirt. And it has damages. So I would suggest to you, Your Honor, that that was a fiction that Mr. Joyce tried to testify to to avoid the greater standard of proof of clear and convincing when you're seeking to get specific performance of an oral agreement. So remind me of the standard here, legal mal case, case within a case. What is their burden at trial? Let me just pinpoint my question here as to causation. Do they have to show that had they made this argument, it absolutely positively would have won? Do they have to say it was reasonably likely it would have been meritorious? What did he have to prove? He had to prove that had the $4.2 million agreement been asserted, more likely than not, the trial effect would have found that that $4.2 million had been established and that there were damages from it. That's the case within the case. Interestingly on that, Mr. Joyce could only give the opinion of maybe 60% chance. And I don't know what that means. But again, I'm not saying it's not. But I'm saying the judge prose, who had the ability to listen to Mr. Joyce, who just happened to be Mr. Oakerman's landlord and they collaborated on cases, she was free to consider that testimony and reject it, which she did. And after hearing all of the evidence, all of the testimony, observing the demeanor of the witnesses over 15 days and with every opportunity for all the parties to submit what they believe their take on the evidence was. Let me ask you one more question. Yes. Do we have to defer to what the trial court or Mr. Joyce or Mr. DeVito thinks is the duty in this case, whether the information would have put a reasonable lawyer on notice to inquire? Do we owe deference to the trial court's determination on that? So the... It's not a defining effect to me, but you tell me what you think. Well, I do believe that it is a defining effect as to what the standard of care is under the circumstances, meaning the circumstances of a client who comes in and has this raft of papers and these facts. That is a defining effect as to what the standard of care requires. We've cited the cases to the court in our booths. I think it's House v. Maddox, which relies on a federal court case, that says that the court... The fact that it was tied to the bench does not obviate the need for expert testimony, that there still needs to be expert testimony about what is required under the circumstances of the case. Yes, but doesn't the trial judge get to make that call? And isn't the burden now on appeal for Nelson to show that her finding or accepting apparently the testimony of DeVito over Joyce has to be against the manifesto? Yes, directly yes. And so, but I guess my point in that is that that's just a cue to a trial judge has the ability to give whatever weight the trial judge chooses to give to expert testimony, as opposed to the trial judge or any judge saying, I believe this should have happened under the circumstance, because that would then obviate the need for expert testimony that the law in Illinois says is required to prove a legal malpractice case, at least as it relates to breach of duty. Unless there are any other questions, Your Honor, I would respectfully request that the court affirm the judgment of the trial court in its entirety and without modification. Thank you for your time. Thank you, Mr. Chairman. Thank you, Your Honor. Just as to a few quick points, if I could, I know you're ringing bells with time. I just like that it might not be in order. Judge McBride, we did not allege in our complaint that they should have sued for specific performance. Specifically, it's at page three of our reply brief, in a footnote, I cite the complaint. We allege they should have sued for damages. We also allege that when Mr. Carrillo sued to enforce the options, there was a big fight over what the price was, and there was an act of negligence that said, in the argument over the price, they should have asserted that, well, Mr. Carrillo agreed to the $4.2 million price, but they never did. And this was after a point in 06, when the court had said, get the options, but the court said we're going to have another litigation on the price. Nelson wrote, and it's an exhibit in here, and I give you the citation, it's an August 29th memo, 06. Nelson wrote to Shifflett and said, well, don't forget, Carrillo agreed to pay $4.2 million, and Shifflett was at that point litigating over what the price should be, and he ignored that. So it's in here, and it's all in our briefs in some detail, that there was never an argument about, we never said specific performance, the defense raised it as a straw man to try to shoot it down. Secondly, the trial court made no finding and didn't comment about whether Gatziolas had a duty to inquire. It just said Gatziolas wasn't aware. We don't know what the trial court thought of that. But Gatziolas himself admitted that he was on notice and that it would have caused him to ask questions. That's the testimony, and I quoted it in our brief. And I said, did you ask questions? No, I didn't ask. So the answer to the question is, I don't even look at the duty Mr. Gatziolas imposed on himself as well as all of the other testimony. But, you know, Mr. DeVito at trial barely read any of the record that he admitted to us and it came out on cross-examination. I didn't dwell on it. He didn't read the Julie Thomas deposition. He didn't even know that Julie Thomas had a firm or reward deposition. He hadn't read that stuff, so how could he give an opinion as to what they would have found if they had looked? On the question about whether this is a moving target, I think that question is answered by the third-party the third-party disinterested witnesses. They were hypnotized. They said, Julie Thomas wrote an email and said, quote, quote, this is key, the original stock purchase agreement, she's not referring to a discussion or a negotiation, included both Plaza and Mall. The total selling price to our understanding was $4.2 million. Quote, next email, this information was represented to us by Rick Curia and then she said it happened in November of 2004. Mr. Newell, the same thing, they fixed the target. That the December 21st approval, quote, was as a result of an agreement between Mr. Nelson and Curia whereby Nelson agreed to sell his shares to Mr. Curia for $4.2 million. And they all said, we have to hear that from both the buyer and the seller. That's what's required. Now, if that isn't an admission, admissible by a third-party, that Curia said the target is fixed, I don't know what is. And that is overwhelming and it was uncontradicted. That's, so this idea about the moving target was fixed by these disinterested third-parties. And I think what's key here, I didn't mention it at the outset, remember what Mr. Nelson said, and they admitted it and it's in our briefs. Mr. Nelson told Gatzielis, Gatzielis admitted it, what I want is $4.2 million, and I want to sell. And what do they do to file a lawsuit to deny the right of Curia to purchase? If they could have won it, it would have left Mr. Nelson with a dealership and an unhappy partner. They didn't even sue for what he asked them to do. So the question of whether they should have inquired when he started telling them about the $4.2 million, finally, this question, and I'll close on this. Mr. Truckell likes to focus on the things that didn't happen. That the manufacturer said, send us all these documents so we can finalize. Curia was the guy to send the documents. He's the buyer. He's the new dealer who has to be approved. He welched. He repudiated. I cited the cases. It's not really questionable. When one party to a contract repudiates it, the law is clear that he can't then come into court and say you can't enforce the contract because the conditions I was supposed to fulfill weren't met. It could have gotten done by December 31st or shortly thereafter. And December 31st was not a magic date. This court, and every appellate court, and the Illinois Supreme Court have made it crystal clear. I only cited a couple of cases. There are hundreds. The time is of the essence provisions in contracts. I'm talking about the written time is of the essence provisions that say this deal must close by a certain date, and if it doesn't close, there's no deal, and so forth. Those are not enforced. They're only enforced if the parties stand and the witnesses stand and say, you know, we really meant it. Because if we didn't close, then some bad things would happen. In this case, Curia testified that December 31st was not an important date. And Nelson was asked to testify that it was just a goal because they know they don't control the bureaucrats at the manufacturers. They've got to do the paperwork. They sent it in in early November. It was kind of a reach to get it done by the end of the year. They don't control it. Do we think? Here's a man who was there for 15 years, Curia, as a general manager, looking for the day to take over from the boss. Here's Mr. Nelson, who was head and arrows, had a very bad health crack once out. They reached a deal for $4.2 million. New Year's Eve, the clock tolls. Does Nelson say, you know what, that's it, I don't want to have any more? It's nonsense. This date didn't mean anything to them. It was just a goal. And our case law holds that that's true. So in terms of whether that was a key provision of the oil agreement, it wasn't. And the evidence is clear that it wasn't. So all you have to know, just to know whether an agreement could be proved, is did these people reach an agreement on the key term, the sale of the stock for $4.2? That was agreed. And if you go back, and I did go back, I took out my first year of contracts case law when I was working on this case. And the law in this country and in Illinois is, there wouldn't be a case if it was all neat. Cases on oil contracts come to the court with a lot of confusing testimony. This court, and I can't quote it because it was an unpublished opinion, had an oil contract case last spring that Justice Gordon wrote the opinion, and it was just as messy as this one was. And what the cases say is that the court is to look at all the evidence, and if the court can discern what they agreed on, there is a contract. And here, based on their conduct, and I cite the Midland Hotel case and these other cases, there's no question you can discern what the contract was. A stock deal for $4.2, period. Would it have been nice to have other things? Yes. But it wasn't ultimately part of the deal that should have been enforced. And it takes the lawyers some effort to sort it out. Nelson got on the stand and he said, I didn't know if I could take that $4.2 million in agreement to court. I didn't come marching in and say, hey, sue him on this. What he said was, and what Gadsdell has admitted was, that what he wanted to know is, what are my contract rights with this land if I have any at all? You sort it out. And they didn't, and that's the negligence. And if they had, they could have enforced it. And I think the manifest way is overwhelming, the fact that there was a lie on it. As Mr. Gadsdell said, I agree. Only meaning that almost all of it showed that there was a contract, a meeting of the minds that should have been enforced. And we would ask this court, and I've never asked for it before, but when I finished this brief, I thought it was so powerful to ask for it under 366, that you can actually enter judgment for the plaintiff here on the existence of the oral contract. There's no more facts to be known. And the alternative, I think it has to be retried. And we respectfully ask for that relief. Thank you so much, Anne. Thank you for your indulgence here on the time. Thank you. All right, the court will take the matter under advisement, issue an order as soon as possible to allow communion to it. Now, on a personal note, I want to thank you for accommodating my schedule. I'm waiting for the sun to go so I can get started on that period. All right.